**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| WESTINGHOUSE ELECTRIC COMPANY LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>MICHAEL E. KIRST,<br><br>*Defendant.* | Case No. 2:21-CV-1559<br><br>**COMPLAINT AND DEMAND FOR TRIAL BY JURY** |

Plaintiff Westinghouse Electric Company LLC ("Plaintiff" or "Westinghouse"), by and through its undersigned counsel, respectfully submits this Complaint against Defendant and former employee Michael E. Kirst ("Defendant" or "Kirst"), and states as follows:

## THE PARTIES

1.      Westinghouse is a Delaware limited liability company with its principal place of business located in Pennsylvania, at 1000 Westinghouse Drive, Cranberry Twp., PA 16066.

2.      Kirst is a United States citizen. Upon information and belief, Kirst is domiciled in Belgium at 1050 Brussels, avenue Louise 337.

3.      All necessary and indispensable parties have been joined.

## JURISDICTION AND VENUE

4.      This is a civil action seeking damages for, among other things: (i) violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq*. ("DTSA"); (ii) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"); and (iii) for related claims under the laws of

this Commonwealth, namely breach of contract, breach of fiduciary duty, conversion, declaratory judgment, and unjust enrichment.

5.      The parties to this action are diverse in citizenship, and the amount in controversy exceeds $75,000.

6.      This Court has jurisdiction pursuant to the following statutes:

    a.   28 US.C. § 1331, giving district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States;

    b.   28 U.S.C. § 1836(c), giving district courts original jurisdiction over civil actions brought under the DTSA;

    c.   28 U.S.C. § 1332, giving district courts jurisdiction over civil actions in which the parties are diverse in citizenship and the amount in controversy exceeds $75,000; and

    d.   28 U.S.C. § 1367, giving district courts supplemental jurisdiction over state-law claims that are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

7.      This Court has personal jurisdiction over Defendant in this action under Federal Rules of Civil Procedure Rule 4 and 42 Pa. C.S.A. § 5301(a)(1) because Kirst expressly consented to personal jurisdiction before this Court. Specifically, in the Confidentiality, Non-Solicitation, Non-Disparagement Agreement (the "Confidentiality Agreement"), executed by and between the parties,[1] Kirst agreed to "irrevocably submit to the personal and exclusive jurisdiction of the United States District Court for the Western District of Pennsylvania … in any action or proceeding relating to this [Confidentiality] Agreement." *See* Ex. A, § 16. Through the Confidentiality

---

[1] A true and correct copy of the Confidentiality Agreement is annexed hereto as **Exhibit A**.

Agreement, Kirst also "waive[d] any objections to the venue and to the personal jurisdiction of such Court[]." *See id*.

8.     Therefore, venue is proper in the United States District Court for the Western District of Pennsylvania pursuant to the Confidentiality Agreement (*see* Ex. A, § 16) and 28 U.S.C. § 1391.

## NATURE OF THE ACTION

9.     This is an action brought by Westinghouse, a United States-based company in the business of supplying safe and innovative nuclear technology and energy, against its former Vice President, Kirst.

10.     As a term and condition of his employment with Westinghouse, Kirst executed the Confidentiality Agreement, wherein he agreed, among other things: (i) not to use or disclose Westinghouse's Confidential Information (as defined below), other than for the benefit of Plaintiff; and (ii) to return all of Westinghouse's Confidential Information upon his separation from the company, for any reason.

11.     In late 2019, Kirst was temporarily performing employment services on behalf of Westinghouse in Belgium, pursuant to an Expat Agreement (defined below) executed between Westinghouse and Kirst. Westinghouse exercised its contractual right and requested that Kirst return from his temporary post in Belgium and resume working in the United States.  Kirst refused. Knowing that his refusal would ultimately result in his voluntary separation from his employment with Westinghouse, Kirst surreptitiously emailed Confidential Information from his Westinghouse email account (the "Corporate Account") to his personal gmail account (the "Personal Account"). He did not return any of the misappropriated Confidential Information to Westinghouse after his separation. Westinghouse, therefore, brings this action against Kirst seeking judgment for: (i)

violation of the DTSA; (ii) violation of the CFAA; (iii) breach of the Confidentiality Agreement; (iv) breach of the common law duty of loyalty; (v) violation of the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S.A. § 5301, *et seq.*; and (vi) common law conversion of business information.

12.     After his separation, Kirst filed a lawsuit against Westinghouse in Belgium, seeking, among other things, to avail himself of the protections of Belgian employment law (the "Belgium Action"). Kirst contractually agreed, however, in the Expat Agreement, that all employment-related disputes of any sort between Westinghouse and him would be subject to Pennsylvania law and adjudicated before a federal or state court in the Commonwealth of Pennsylvania. Westinghouse, therefore, also seeks judgment against Kirst for: (i) breach of the forum selection clause of the Expat Agreement; and (ii) breach of the choice-of-law provision of the Expat Agreement.

13.     Finally, in the Belgium Action, Kirst argues that he was a Belgium-based, not U.S.-based, employee of Westinghouse. Kirst's argument is contradicted by his Expat Agreement, which explicitly states that Kirst remained, at all times, a U.S.-based employee. Westinghouse, therefore, seeks a declaratory judgment, pursuant to 41 Pa. C.S. § 7531, *et seq.*, that Kirst: (i) remained a U.S.-based employee during his temporary assignment in Belgium; and (ii) expressly waived his right to the protections of Belgian law.

14.     In the alternative, should this Court find that Kirst became a permanent Belgium-based employee or is entitled to the protections of Belgian law, Westinghouse seeks judgment ordering Kirst to repay to Plaintiff all of the U.S. benefits he received from Westinghouse as an expat, including, but not limited to, tax equalization, U.S. unemployment taxes, bonuses, allowances, and pension payments.

## STATEMENT OF FACTS

I.   **KIRST'S EMPLOYMENT WITH WESTINGHOUSE**

   A.   **Kirst Is Hired by Westinghouse in September 1996**

   15.   In September 1996, Westinghouse hired Kirst in a government affairs role in the United States, pursuant to an employment contract of indefinite duration governed by U.S. law.

   16.   In 2005, Westinghouse temporarily assigned Kirst to its activities in Sweden and later assigned Kirst on an expatriate assignment in Belgium as Director, Central & Eastern Europe Fuel/CR&S Regional Vice President – Central Eastern Europe, and later Vice President for Strategy and External Affairs for the Westinghouse business unit for Europe, the Middle East, and Africa ("EMEA"). In this assignment, he reported directly to the President of the Westinghouse EMEA business unit, and interacted on behalf of Westinghouse with government officials and external stakeholders throughout EMEA.

   17.   During his employment, Kirst was provided with a Company-owned laptop (the "Work Laptop"), company-owned cell phone (together with the Work Laptop, the "Company Devices"), and his Corporate Account.

   18.   Kirst's use of the Company Devices and Corporate Account was governed by the Company's Acceptable Use of Technology Policy (the "Acceptable Use Policy").[2]

   19.   The Acceptable Use Policy set forth policies and procedures to ensure that the Confidential Information stored on Westinghouse's servers and devices remained confidential. For example, the Acceptable Use Policy stated, in pertinent part:

   **1.3   Westinghouse Owned Mobile Device Policy**

   Mobile devices include laptop computers, tablet computers, iPads, mobile phones, or similar devices capable of processing, transmitting, or storing information.

---

[2] A true and correct copy of the Acceptable Use Policy is annexed hereto as **Exhibit B**.

1.3.1   Only mobile devices approved and issued by the Westinghouse IT Department are permitted to access networks, systems and data used to perform Westinghouse business…

1.3.3   Mobile devices not owned by Westinghouse are not permitted to connect to either Westinghouse internal computer networks or customer internal computer networks…

1.3.4   Westinghouse data may only be transmitted to, from, or stored on Westinghouse-owned mobile devices.

1.3.5   Westinghouse and customer data stored on mobile devices must be stored encrypted using Westinghouse-approved encryption products and technologies…

1.3.7   Westinghouse mobile devices will be securely configured in accordance to Westinghouse security standards described in the Westinghouse Computer Security Standard 204: *Workstations, Laptops, and Mobile Devices*…

## 1.8   Email and Instant Messaging

1.8.3   In regards to Westinghouse email and instant messaging services, users are PROHIBITED from performing the following activities…
- Manually or automatically forwarding email to a commercial email service (e.g., YahooMail, AOL, Gmail, HotMail) or another organization's email system;
- Forwarding or downloading Westinghouse email or to a personal (non-Westinghouse) device (e.g., mobile device, laptop, tablet);
- Storing Westinghouse email attachments to a personal (non-Westinghouse) device.

## 1.12   Asset Management

1.12.2.3   Appropriate Use of Westinghouse Computer Systems

All users of Westinghouse computer systems must protect company computers from illegal or damaging actions, either knowingly or unknowingly. The following are some examples of improper uses of Westinghouse computer systems, which are therefore prohibited:

- Using computer systems for purposes other than legitimate business. Computer systems may not be used for private commercial purposes, commercial gain, partisan political purpose, other non-business related activity, or any unlawful activity…

– 6 –

- Copying, reading, accessing, using, misappropriating, altering, publishing, or destroying computer files of another individual or the attempt to do so without the permission of the data owner.

*See* Ex. B.

**B.      Kirst Agrees to Perform Work on Behalf of Westinghouse in Belgium on a Temporary Basis Pursuant to an Expat Agreement**

20.      On or about April 17, 2008, Westinghouse and Kirst executed an engagement letter, whereby Kirst would be expatriated, on a temporary basis, to Belgium to provide services there on behalf of Westinghouse (the "2008 Engagement Letter").[3]

21.      Pursuant to the 2008 Engagement Letter, the parties expressly agreed that Kirst would remain an employee of Westinghouse during his temporary assignment in Belgium and that the terms and conditions of his employment would remain unchanged unless explicitly stated otherwise. *See* Ex. C.

22.      The 2008 Engagement Letter also provided Kirst with, among other things:

a.   A U.S. base salary, less U.S. tax deductions;

b.   The ability to remain on the Company's bonus plan for the duration of the temporary assignment, paying tax at his marginal rate of home country income;

c.   The provision of tax consultants in both the U.S. and Belgium to provide advice and guidance to Kirst before, during, and upon completion of the temporary assignment;

d.   Maintenance and the ability to continue to contribute to the Company's pension plan; and

e.   A number of costly allowances to cover the costs normally incurred by posted workers temporarily working abroad.

---

[3] A true and correct copy of the 2008 Engagement Letter is annexed hereto as **Exhibit C**.

*See id.*

23.     The 2008 Engagement Letter also incorporated by reference the Company's Long-Term International Assignment HR Policy (the "LT Policy").[4] The LT Policy states, in relevant part:

> Section 4.5: An assignee on an international assignment remains an employee of his/her home company during the assignment period. All other aspects of employment remain in force except insofar as they are varied by the policy and International Assignment Letter, which set out variations.  Any disputes arising that cannot be settled will be subject to the grievance procedure of the home country [the "Expat Choice-of-Law Provision"] and ultimately, if required, submitted to the relevant court of the home country [the "Expat Forum Selection Provision"].
>
> Section 5.3.2: An assignee on a long-term assignment is expected to return to the home country.
>
> Section 7.0: During an international assignment, the assignee will continue to receive a base salary and incentives per the home country scheme… The assignment compensation program has three major objectives:
> 1.   Tax equalization - which ensures, in general, that the assignee pays no more and no less tax on income and benefits than he/she would have paid while working in the home country…
> [2. Base Salary - ] Base salary is expressed in home country currency and is subject to changes, reviews and progression according to home country compensation guidelines. Using a home country-based salary achieves two objectives:
> 1.   It establishes a compensation level for the assignee that is comparable to that of home country counterparts.
> 2.   It facilitates re-entry into the home country by providing continuity in compensation.
>
> Section 7.1.2: Bonuses/Performance-Related Pay: If an assignee is eligible to participate in the home company's bonus or performance-related pay scheme, eligibility will continue during the assignment. Targets will be set and agreed to by the assignee's line managers in the home and host companies. The monitoring of performance against the agreed targets will be the responsibility of the host company line manager. Bonus payments will be subject to the deduction of home-based hypothetical taxes.

*See* Ex. D.

---

[4] A true and correct copy of the LT Policy is annexed hereto as **Exhibit D**.

24.     Kirst's expatriation to Belgium was renewed several times (i.e., in May 2010, May 2012, December 2013, and January 2019) (the "Renewal Agreements") (collectively with the 2008 Engagement Letter and LT Policy, the "Expat Agreement").[5]

25.     Each time, a new engagement letter was entered into by the parties. Each engagement letter was on the letterhead of Westinghouse, as the parties understood and agreed that Westinghouse remained Kirst's employer at all times. To be sure, the Renewal Agreements each stated that, unless expressly waived, the terms and conditions of employment set forth in Kirst's original employment agreement and the 2008 Engagement Letter remained unchanged and enforceable. *See* Exs. E-H.

26.     Kirst worked for Westinghouse in Belgium from July 2008 to December 18, 2019, under an employment contract governed by U.S. law and a foreign executive tax status for the duration of his assignment, benefiting from a tax equalization system and a U.S.-based salary. Westinghouse also continued to pay into Kirst's Pennsylvania unemployment benefit.

27.     Moreover, during the entirety of his employment tenure with Westinghouse, Kirst received performance reviews from Westinghouse, and benefitted from Westinghouse's bonus and pension plans.

28.     During more than twenty (20) years of employment with Plaintiff, Kirst never questioned the fact that his employer was Westinghouse, that his employment contract was governed by U.S. law, and/or that he was working in Belgium in a temporary status. To be sure, for the entirety of his tenure with Westinghouse, he received paystubs listing Westinghouse as his employer, signed documents that identified him as an employee of Westinghouse (*see e.g.*, Ex. A),

---

[5] True and correct copies of the Renewal Agreements are annexed hereto as **Exhibits E, F, G, and H**.

took advantage of the tax equalization afforded to him as an expat employee of Westinghouse, and

identified himself as a Westinghouse employee on his tax returns.

### C.   In 2015, Kirst Signs the Confidentiality, Non-Solicitation, Non-Disparagement Agreement

29.   On April 24, 2015, Kirst executed the Confidentiality Agreement. *See* Ex. A.

30.   In the Confidentiality Agreement, Kirst acknowledged Westinghouse's "legitimate

business interest in protecting [its] customers, employees and goodwill on a world-wide basis

against unfair solicitation and misappropriation of [its] confidential information" and agreed to the

following disclosure restrictions:

> (5)   During and after the termination of my employment with Westinghouse and any Westinghouse Affiliate (whatever the reason), I shall maintain the secrecy of and shall not, directly or indirectly, disclose, use, or permit the disclosure or use of any Confidential Information to or by anyone else, unless such disclosure or use is reasonably necessary to fulfill my duties to Westinghouse or a Westinghouse Affiliate or unless Westinghouse or, as applicable, a Westinghouse Affiliate, consents to such disclosure in advance and in writing.

> (6)   I further agree that the disclosure, use, or allowing someone else to disclose or use Confidential Information would constitute a breach of trust and could cause irreparable injury to Westinghouse or, as applicable, the Westinghouse Affiliates, because it is essential to Westinghouse's and the Westinghouse Affiliates' competitive position that the Confidential Information be kept secret, safeguarded, and not used for my advantage or the advantage of others.

> (10)   Upon the termination of my employment with Westinghouse and all Westinghouse Affiliates for any reason, I shall promptly return to Westinghouse or the applicable Westinghouse Affiliate the originals and copies of all materials, documents and computer-related or generated information concerning Westinghouse's or, as applicable, the Westinghouse Affiliate's business, including, but not limited to, Confidential Information. I also agree to maintain the integrity of all electronically-stored information and agree not to alter, damage or destroy such information before returning it to Westinghouse or, as applicable, a Westinghouse Affiliate, including not deleting any information from my computer, phone, or storage device.

> (11)   I agree that the limitations contained in Section[] 5 … are reasonable and necessary to protect the legitimate business interests of Westinghouse and the Westinghouse Affiliates, given my position and job duties, my exposure to Confidential Information, and Westinghouse's and the Westinghouse Affiliates' global presence…

– 10 –

*See* Ex. A, §§ 5, 6, 10, and 11.

31.     The Confidentiality Agreement defines "<u>Confidential Information</u>" to include:

… all of Westinghouse's and the Westinghouse Affiliate's trade secrets, business secrets, technical secrets, research and development efforts, formulas, methodologies, inventions, know-how, customer information, including without limitation, the identity of personnel in the employ of customer and prospective customers, the nature and content of customer and vendor contracts, the amount or kind of customer purchases, and information customers provide to Westinghouse or a Westinghouse Affiliate on a confidential basis, along with all other business information not generally known to the public, in any and all tangible embodiments thereof, including, but not limited to, drawings, computer software, computer hardware, designs, specifications, estimates, blueprints, plans, data, reports, processes, models, memoranda, notebooks, notes, sketches, artwork, mock-ups, letters, manuals, documents, customer lists (including lists of prospective customers), employee privacy records such as SSNs and medical records, policy, procedure and training manuals, billing procedures and methods of operation, marketing and/or sales plans and proposals, financial information, costs and/or pricing information and all other competitive business information, photographs, motion pictures, and copies of all or portions thereof which in any way are related to the business or business plans of Westinghouse or a Westinghouse Affiliate.

*See id.* at § 4.

32.     Kirst further: (i) agreed to "irrevocably submit to the personal and exclusive jurisdiction of the United States District Court for the Western District of Pennsylvania … in any action or proceeding relating to this [Confidentiality] Agreement;" (ii) "waive[d] any objections to the venue and to the personal jurisdiction of such Court[];" and (iii) agreed that any disputes arising out of the Confidentiality Agreement would "be interpreted, enforced, and governed by and under the laws of the Commonwealth of Pennsylvania, without giving effect to its conflicts of laws principles." *See id.* at §§ 16 and 23.

### D.     Westinghouse Exercises Its Right to Request Kirst Return to the United States

33.     On October 28, 2019, Westinghouse exercised its right under the Expat Agreement to end Kirst's temporary assignment in Belgium and directed him to return to the United States.

34.     Kirst responded by requesting to remain working for Westinghouse in Belgium.

35.     On October 31, 2019, in order to arrange for Kirst's return to the United States and for the parties to discuss Kirst's desire to remain in Belgium, Westinghouse sent Kirst a letter extending his temporary expat position in Belgium until December 31, 2019, along with a letter of repatriation (the "Return Letters").[6]

36.     On November 20, 2019, Kirst emailed Victoria Lowry, Westinghouse's Director of Human Resources EMEA ("Ms. Lowry), Trish MacDonald, Westinghouse's Director of Global Mobility, People and Culture ("Ms. MacDonald"), and Brenda Boyd, Westinghouse's U.S. Human Resources Director ("Ms. Boyd"), denying and refusing his repatriation, and falsely claiming that his temporary role evolved into a permanent position in Belgium.[7]

37.     On November 21, 2019, Ms. Lowry confirmed by email to Kirst Westinghouse's prior discussion regarding, among other things, the conditions that would have applied in the event of a permanent position in Belgium, and confirmed that since no permanent role could be identified for Kirst locally in Europe, the Middle East, or Africa, Kirst would be repatriated to the United States by no later than December 31, 2019, pursuant to the Expat Agreement. Since a specific role had yet to be identified for Kirst in the United States, Westinghouse offered to provide Kirst with travel to the United States in late November and to pay his December salary to allow the parties to further discuss his employment with Westinghouse. *See* Ex. J.

38.     On December 18, 2019, a telephone conference took place between Kirst, Ms. Boyd, and Ms. Lowry. During this telephone conversation, Kirst was reminded that: (i) his assignment in Belgium was ending on December 31, 2019; (ii) no role existed for him in Belgium for the future; and (iii) he was being repatriated. Kirst stated that he did not want to return to the United States. Ms. Boyd and Ms. Lowry reiterated to him that he agreed from the beginning that

---

[6] True and correct copies of the Return Letters are annexed hereto as **Exhibit I**.
[7] A true and correct copy of Kirst's November 20, 2019 email is annexed hereto as **Exhibit J**.

his assignment in Belgium would be temporary and that, at the end of his temporary assignment in Belgium, he would be required to return to the United States.

      **E.**    **Kirst Uses the Company Devices and Corporate Account to Misappropriate Westinghouse's Confidential Information and Trade Secrets**

      39.    Anticipating that his refusal to return to the United States would ultimately result in his separation from his employment with Westinghouse, Kirst misappropriated Westinghouse's Confidential Information.

      40.    Specifically, he used his Company Devices to forwarded crucial strategic initiatives, global market trend analyses, and competitor updates from his Corporate Account to his Personal Account.

      41.    On August 10, 2019, Kirst forwarded from his Corporate Account to his Personal Account email correspondence setting forth information regarding Westinghouse's strategic initiatives.

      42.    On August 26, 2019, Kirst forwarded from his Corporate Account to his Personal Account a word document labeled "EMEA Government Affairs." This document set forth key areas and actions required to support Westinghouse's business plan.

      43.    On September 1, 2019, Kirst forwarded from his Corporate Account to his Personal Account a word document labeled "Ukraine Briefing Notes 2." This document set forth Westinghouse's areas of focus and key points for a significant strategic Westinghouse initiative involving Ukraine.

      44.    On November 8, 2019, and November 20, 2020, respectively, Kirst forwarded from his Corporate Account to his Personal Account email correspondence with Samuel Mikhelson, Deputy Chief of Political/Economic Section, U.S. Embassy Sofia, Bulgaria. These highly

confidential emails contained extraordinarily sensitive Westinghouse strategic commercial information regarding potential new business.

45.     On December 6, 2019, Kirst forwarded from his Corporate Account to his Personal Account email correspondence regarding Westinghouse's Ukraine-European Union Energy Bridge project. This email contained highly confidential information regarding this project.

46.     On December 16, 2019, Kirst forwarded from his Corporate Account to his Personal Account a document titled "Conventions 12-19." This document set forth the list of International Nuclear Third-Party Liability Conventions, obtained by Westinghouse through CIGNL, an organization of which Westinghouse is a member. The email explicitly states that it is "CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OUTSIDE CIGNL."  (Collectively, with the Confidential Information discussed in Paragraphs 41 to 47 of this Complaint, the "Misappropriated Information").[8]

47.     The Misappropriated Information is valuable property that came about only after a great investment of time, effort, and funds, and constitutes trade secrets of great monetary value.

48.     To protect the secrecy of the Misappropriated Information, Westinghouse had key employees, such as Kirst, sign non-disclosure and confidentiality agreements (*see e.g.*, the Confidentiality Agreement), uses a password protected email account, developed and implemented policies and procedures to ensure that the Confidential Information remained secret (*see* Ex. B), and offered only password protected access to all Company electronic systems.

---

[8] The Misappropriated Information constitutes highly confidential and proprietary information and trade secrets of Plaintiff. For this reason, these documents have not been included as exhibits to this Complaint. Plaintiff respectfully submits that it will make these documents available for the Court's *in camera* review, at the Court's discretion.

49.     Mr. Kirst knew the value of this Confidential Information, and, upon information and belief, knowingly, purposefully, and intentionally misappropriated it with intent to use it for his personal gain and benefit, and to harm Westinghouse.

**F.      Kirst Breaches the Expat Agreement by Refusing to Return to the United States From His Temporary Assignment in Belgium, and Voluntarily Separates From His Employment with Westinghouse**

50.     In mid-December 2019, Kirst terminated his employment relationship with Westinghouse by refusing to return to continue his employment relationship with the company in the United States.

51.     On December 19, 2019, Westinghouse issued a letter to Kirst acknowledging his voluntary separation from his employment relationship with Westinghouse (the "Acknowledgment Letter").[9]

52.     On January 31, 2020, Kirst sent Westinghouse Electric Belgium S.A. a demand letter, claiming to have been dismissed and to be entitled to compensation in lieu of notice pursuant to Belgian law (the "Demand Letter").[10]

53.     On March 2, 2020, Westinghouse Electric Belgium S.A. responded to the Demand Letter by reminding Kirst that he was: (i) employed by Westinghouse as a U.S.-based employee, and was not employed by Westinghouse Electric Belgium S.A.; and (ii) not entitled to the protection of Belgian employment laws.[11]

54.     On May 29, 2020, Kirst filed the Belgium Action against the Company and Westinghouse Electric Belgium S.A., alleging, among other things, that he is entitled to compensation in lieu of dismissal notice, pursuant to Belgian law.

---

[9] A true and correct copy of the Acknowledgment Letter is annexed hereto as **Exhibit K**.
[10] A true and correct copy of the Demand Letter is annexed hereto as **Exhibit L**.
[11] A true and correct copy of Plaintiff's March 2, 2020 letter is annexed hereto as **Exhibit M**.

## CLAIMS FOR RELIEF

### Count I - Trade Secret Misappropriation Under the Federal Defend Trade Secrets Act
### (18 U.S.C. 1832 *et seq.*)

55.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

56.    While employed by Westinghouse, Kirst gained access to Westinghouse's Confidential Information, including, among other things, Westinghouse's confidential business, financial, customer, and technical information.

57.    Westinghouse expended great time, money, and resources to develop and protect the Confidential Information.

58.    While employed by Westinghouse, Kirst stole, misappropriated, took, and carried away Westinghouse's Confidential Information by forwarding it, without permission or authorization of any sort, from his Corporate Account to his Personal Account.

59.    The Misappropriated Information constitutes a "trade secret" under 18 U.S.C. § 1839(3).

60.    The Misappropriated Information derives independent economic value from not being generally known to, or ascertainable by, competitors and other parties outside of Westinghouse or its business. Among other sources of economic value, the Misappropriated Information enables Westinghouse to service and maintain existing customers, to acquire new customers, and to operate its business at appropriate profit margins.

61.    Westinghouse made reasonable efforts to maintain the secrecy of the Misappropriated Information, including by having employees (such as Kirst) sign non-disclosure and confidentiality agreements, imposing password requirements to access the Misappropriated

Information, and enacting written policies and procedures under which all employees are required to:

    a.  maintain the confidentiality of Westinghouse's trade secrets and other proprietary and confidential information;

    b.  acknowledge that any Confidential Information developed by employees is/was the exclusive property of Westinghouse; and

    c.  upon termination of employment, return any materials relating to Westinghouse's business and/or relating in any way to Confidential Information.

*See* Exs. A and B.

62. Upon information and belief, Kirst misappropriated and converted the Misappropriated Information for the benefit of himself and perhaps others.

63. Upon information and belief, Kirst has used, or intends to use, the Misappropriated Information for his personal gain, and/or the personal gain of others, to the detriment of Westinghouse, by using the Misappropriated Information to solicit and service Westinghouse's customers both across state lines and internationally.

64. Defendant's actions in converting and misappropriating the Misappropriated Information for his personal gain, and perhaps the gain of others, were willful, wanton, and malicious, and were undertaken with at least reckless disregard for the rights of Westinghouse, and in violation of his fiduciary duties to Westinghouse.

65. As a direct and proximate result of Kirst's wrongful conduct, Westinghouse has suffered, and will continue to suffer, damages in an amount to be determined at trial, plus

consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

66.     Westinghouse has been damaged by Kirst's acts of trade secret misappropriation in ways for which Westinghouse has no adequate remedy at law.

67.     Westinghouse will continue to be damaged by such misappropriation unless Kirst is enjoined by this Court from using or disclosing the Misappropriated Information.

### Count II - Violation of the Computer Fraud and Abuse Act
**(18 U.S.C. § 1030)**

68.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

69.     In order to enable Kirst to perform his job duties, Westinghouse provided Kirst with password protected access to its servers through the Company Devices and Kirst's Corporate Account.

70.     Westinghouse's servers and Kirst's Company Devices and Corporate Account were used in interstate and international commerce.

71.     Westinghouse securely maintained its Confidential Information on its password protected servers.

72.     To protect the secrecy of the Confidential Information located on its servers, Westinghouse: (i) had Kirst execute the Confidentiality Agreement as a term and condition of his employment (*see* Ex. A); (ii) mandated that Kirst abide by the electronic device policies and procedures of Westinghouse (*see* Ex. B); and (iii) made access to the server password protected.

73.     Despite his contractual obligations and Westinghouse's policies and procedures governing the use of electronic devices, Kirst exceeded his authorized access to Westinghouse's devices and server by using his Company Devices to email from his Corporate Account to his

Personal Account the Misappropriated Information, without the knowledge, consent, or authorization of Westinghouse.

74.     The accessed server, Company Devices, and Corporate Account each constitute a "protected computer," as that term is used in the CFAA, because the devices were connected to the Internet and were used in interstate and foreign commerce and communication as a vehicle for Westinghouse to conduct business throughout the United States and abroad.

75.     By sending the Misappropriated Information from his Corporate Account to his Personal Account, Kirst caused the transmission of a program, information, code or command and, as a result of such conduct, intentionally caused damage, without authorization, to one or more protected computers.

76.     Kirst knew or should have known that his conduct was wrong and strictly prohibited under his Confidentiality Agreement and Westinghouse's policies and procedures.

77.     Kirst intentionally accessed, by means of conduct involving interstate communication, Westinghouse's protected computers and email system without authorization and/or in excess of his authorization, and transferred Confidential Information from Westinghouse's computers and database to his Personal Account.

78.     Kirst knowingly and with intent to defraud, accessed Westinghouse's protected computers and email system without authorization and/or in excess of his authorization, and by means of such conduct, furthered his intended fraud and obtained things of value to Westinghouse.

79.     Kirst intentionally accessed Westinghouse's protect computer and email system without authorization and/or in excess of his authorization, and, because of such conduct, recklessly caused damage to Westinghouse.

80.     As a result of Kirst's conduct, Westinghouse has suffered damages and loss in excess of $5,000.

81.     Specifically, Westinghouse's damages include, but are not limited to, the hiring of a forensic computer examiner to determine the scope of Kirst's breach and a damage assessment; the hiring of counsel to bring this legal action; Westinghouse's management team's time necessary for addressing, responding to, and remediating Kirst's wrongdoings; and the value of the information Kirst retrieved from Westinghouse's property.

82.     Westinghouse is entitled to an award of damages for his multiple breaches of the CFAA and attorneys' fees pursuant to the CFAA.

### Count III— Breach of the Confidentiality Agreement

83.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

84.     The Confidentiality Agreement constitutes a valid and enforceable contract between Kirst and Westinghouse.

85.     In consideration of his employment with Westinghouse and the compensation and benefits paid to him as an employee of Westinghouse, Kirst agreed to the terms and conditions of, and executed, the Confidentiality Agreement. *See* Ex. A.

86.     The Confidentiality Agreement prohibited Kirst from taking, using, or disclosing the Confidential Information for any purpose other than to perform his employment duties on behalf of Westinghouse. *See id*. at §§ 5, 6, and 11.

87.     Moreover, the Confidentiality Agreement prohibited Kirst from retaining the Confidential Information post-employment with Westinghouse. *See id*. at § 10.

88.     These are material terms of the Confidentiality Agreement.

89.     Kirst breached the Confidentiality Agreement by: (i) emailing the Misappropriated Information from his Corporate Account to his Personal Account without authorization to do so and (ii) failing to return the Misappropriated Information to Westinghouse upon his separation.

90.     As a direct and proximate result of Kirst's breach of the Confidentiality Agreement, Westinghouse has suffered, and will continue to suffer, damages in an amount to be determined at trial, plus consequential damages, attorneys' fees and pre- and post-judgment interest to the extent permitted by law.

### Count IV— Breach of Common Law Fiduciary Duty and Duty of Loyalty

91.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

92.     In his employment capacity, Kirst had access to Westinghouse's Confidential Information, including but not limited to customer lists, detailed information about Westinghouse's clients, product development plans, manufacturing processes, technical operations information, marketing materials, sales and business strategies, competitor and market intelligence, pricing models, and capital investments.

93.     Due to his employment in a position of trust and confidence, Kirst had a duty to keep confidential all of Westinghouse's Confidential Information that he learned or obtained during his employment with Westinghouse. As an employee, manager, and agent of Westinghouse, Kirst owed a duty of loyalty to act in good faith and solely for the benefit of Westinghouse in all matters for which he was employed. Thus, he had a duty not to take, use, or disclose Westinghouse's property or Confidential Information for his own purpose or benefit, or the purpose of benefit of a third party.

94.     Kirst's duty of confidentiality and loyalty survived his separation.

95.     Kirst violated his fiduciary duty and duty of loyalty by misappropriating the Misappropriated Information, and refusing to return it following his separation, even after it was demanded by the Company.

96.     Kirst's actions were wrongful under his fiduciary duty and duty of loyalty as an officer, manager, and agent of Westinghouse.

97.     Kirst's actions were willful, wanton, in bad faith, and malicious, and were taken with reckless disregard for the rights of Westinghouse.

98.     Upon information and belief, Kirst has negligently or intentionally used and/or disclosed, or is likely to use and/or disclose, the Misappropriated Information in breach of his fiduciary duty and duty of loyalty.

99.     Upon information and belief, Kirst has breached his fiduciary duty and duty of loyalty to Westinghouse in failing to act in good faith and solely for the benefit of Westinghouse by using and/or disclosing the Misappropriated Information, even though he was trusted with Westinghouse's Confidential Information in order to effectively engage in business on behalf of Westinghouse and to act in the company's best interest.

100.    As a direct and proximate result of Kirst's breach of his fiduciary duty and duty of loyalty, Westinghouse has suffered, and will continue to suffer, damages in an amount to be determined at trial, plus consequential damages, attorneys' fees and pre- and post-judgment interest to the extent permitted by law.

### Count V— Violation of the Pennsylvania Uniform Trade Secrets Act
#### (12 Pa. C.S.A. § 5301 *et seq.*)

101.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

102.    Westinghouse's Confidential Information constitutes "trade secrets" as defined by the Pennsylvania Uniform Trade Secrets Act.

103.    Westinghouse's Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by, the public or Westinghouse's competitors.

104.    Westinghouse has made, and continues to make, reasonable efforts to maintain the confidentiality and secrecy of the Confidential Information.

105.    Kirst both contractually and in a fiduciary capacity had, and continues to have, a duty to maintain the secrecy of Westinghouse's Confidential Information.

106.    Upon information and belief, Kirst's taking, use, and/or disclosure of the Misappropriated Information is willful and malicious.

107.    As a direct and proximate result of Kirst's misappropriation of Westinghouse's Confidential Information, Westinghouse has suffered, and will continue to suffer, damages in an amount to be determined at trial, plus consequential damages, attorneys' fees and pre- and post-judgment interest to the extent permitted by law.

### Count VI— Common Law Conversion of Business Information

108.    Plaintiff incorporated by reference all preceding paragraphs of this Complaint as if fully set forth herein.

109.    Westinghouse has an ownership and possessor interest in its Confidential Information, including the Misappropriated Information.

110.    Kirst intentionally, improperly, and unlawfully exercised dominion and control over Westinghouse's Confidential Information by transferring it from his Corporate Account to his Personal Account without authorization to do so.

– 23 –

111.    Kirst's actions were inconsistent with Westinghouse's rights to, and interests in, its Confidential Information, and resulted in a misappropriation and conversion of the Misappropriated Information, in violation of the common law of the Commonwealth of Pennsylvania.

112.    Westinghouse has demanded that Kirst return the Misappropriated Information, but Kirst has refused.

113.    As a direct and proximate result of the foregoing willful, wanton, reckless, and malicious conduct of Kirst, Westinghouse's property has been misappropriated and converted, and Westinghouse has incurred and continues to incur substantial economic loss.

## Count VII— Breach of the Expat Agreement's Forum Selection Clause

114.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

115.    The Expat Agreement, which incorporates by reference the LT Policy, is a valid and enforceable contract between Kirst and Westinghouse.

116.    Section 4.5 of the LT Policy provides, in pertinent part, that:

    a.    "Any disputes arising that cannot be settled will be subject to the grievance procedure of the home country;" and

    b.    "ultimately, if required, submitted to the relevant court of the home country."

*See* Ex. D.

117.    The Expat Choice-of-Law Provision and Expat Forum Selection Provision are material terms of the Expat Agreement.

118.    Kirst breached the Expat Agreement by: (i) availing himself of Belgian employment laws and (ii) filing an employment-related lawsuit against Plaintiff in Belgium.

– 24 –

119.    Mr. Kirst's actions were willful and purposeful in that he was well aware that his actions violated the express terms of his Expat Agreement. He purposefully sought adjudication in a foreign venue, under foreign law, in order to force Westinghouse to incur additional significant expenses due to litigation in an inappropriate forum and forum non-conveniens.

120.    As a direct and proximate result of Kirst's breach of the Confidentiality Agreement, Westinghouse has suffered, and will continue to suffer, damages in an amount to be determined at trial, plus consequential damages, punitive damages, attorneys' fees and pre- and post-judgment interest to the extent permitted by law.

### Count VIII — Declaratory Judgment
**(42 Pa. C.S.A. § 7532 *et seq.*)**

121.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

122.    Pursuant to the Expat Agreement, Kirst agreed that he was (i) a Pennsylvania-based employee of Westinghouse (ii) subject to and protected by only the laws of the United States and Pennsylvania.

123.    Kirst disputes the contentions set forth in Paragraph 114 of this Complaint.

124.    Pursuant to the Pennsylvania Declaratory Judgment Act, 42 Pa.C.S.A. § 7532, it is respectfully submitted that this Court should enter a declaratory judgment in favor of Westinghouse against Kirst declaring that Kirst (i) remained a Pennsylvania-based employee of Westinghouse until his separation on December 19, 2019, (ii) waived any right to any potential protections afforded under Belgian law, and (iii) pursuant to 42 Pa.C.S.A. § 7538, declaring any other relief this Court deems just and proper.

125.    A declaratory judgment would be useful in resolving this case or controversy. Westinghouse's significant losses are ongoing. By clarifying the parties' rights and duties under

the Expat Agreement, a declaratory judgment would guide the parties in their litigation of Kirst's claims. With the Belgium Action ongoing, Westinghouse's accrued losses due to this dispute have not yet ripened such that a coercive remedy like damages may not be appropriate. Therefore, the declaratory judgment claim would afford Westinghouse relief independent of the breach of contract claims.

126.    For all the reasons set forth above, Plaintiff respectfully submits that it is entitled to an Order declaring that Kirst: (i) at all relevant times was a U.S.-based employee and (ii) waived any employment-related protections and claims afforded under Belgian law.

### Count IX— Attorneys' Fees and Costs (Bad Faith)

127.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

128.    At all material times, Kirst has been without a reasonable basis to refuse to litigate his employment-related claims (as alleged in the Belgium Action) before a court located in the Commonwealth of Pennsylvania, pursuant to Pennsylvania law.

129.    At all material times, Kirst has acted in reckless disregard for his lack of a reasonable basis to litigate the claims he asserts in the Belgium Action before a court located in the Commonwealth of Pennsylvania, pursuant to Pennsylvania law.

130.    At all material times, Kirst has acted in bad faith in refusing to litigate the claims he asserts in the Belgium Action before a court located in the Commonwealth of Pennsylvania, pursuant to Pennsylvania law.

131.    Due to Kirst's bad faith conduct, Westinghouse has been compelled to pursue the instant action for declaratory relief and to incur substantial attorneys' fees and costs in the prosecution thereof, and will continue to incur such expenses into the future.

132.     Pennsylvania law allows an award of attorneys' fees and costs when a party is forced to pursue a declaratory judgment action due to the bad faith of another.

133.     Attorneys' fees and costs are further authorized by 42 Pa.C.S.A. §§ 7538 and 7541, and/or 28 U.S.C.A. § 2202.

134.     For all the reasons set forth above, Plaintiff respectfully submits that it is entitled to an Order declaring that Kirst reimburse it for all reasonable attorneys' fees and costs incurred in bringing its declaratory claims.

<u>Count X— Unjust Enrichment</u>
(Misappropriated Information)

135.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

136.     Defendant makes this claim for unjust enrichment for Plaintiff's improper and unauthorized taking of the Misappropriated Information.

137.     Westinghouse expended great time, money, and resources to develop and protect the Confidential Information.

138.     While employed by Westinghouse, Kirst stole, misappropriated, took, and carried away Westinghouse's Confidential Information by forwarding it, without permission or authorization of any sort, from his Corporate Account to his Personal Account.

139.     The Misappropriated Information derives independent economic value from not being generally known to, or ascertainable by, competitors and other parties outside of Westinghouse or its business. Among other sources of economic value, the Misappropriated Information enables Westinghouse to service and maintain existing customers, to acquire new customers, and to operate its business at appropriate profit margins.

140.    It would be unjust for Defendant to retain the benefit of the Misappropriated Information.

141.    Westinghouse, therefore, respectfully submits that it is entitled to compensatory damages associated with Kirst's unjust enrichment.

## Count XI— Unjust Enrichment
### (In the Alternative to Westinghouse's
### Breach of the Expat Agreement and Declaratory Judgment Claims)

142.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

143.    Defendant makes the claim for unjust enrichment in the alternative to its breach of contract and declaratory judgment claims.

144.    Westinghouse, reasonably believing that Kirst was a U.S.-based employee, paid various benefits to Kirst or on Kirst's behalf, including, but not limited to, a tax equalization benefit in an amount equal to approximately EUR 1,644,674.80 (the "Tax Equalization").

145.    Westinghouse paid the Tax Equalization and other U.S.-based employee benefits on behalf of Kirst because it believed that Kirst was engaging in services on Plaintiff's behalf as a United States based employee.

146.    Should this Court find that Kirst was not a United States-based employee of Westinghouse through, and including, his separation on December 19, 2019, it would be unjust for Defendant to retain the benefit of the Tax Equalization and other U.S.-based employee benefits without full and complete repayment to Westinghouse.

147.    Westinghouse, therefore, respectfully submits that it is entitled to repayment of the Tax Equalization and other U.S.-based employee benefits paid to or on behalf of Kirst, should this

Court find that Kirst was not a U.S.-based employee through and including his separation on December 19, 2019.

### **Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Award Westinghouse Compensatory and punitive damages in an amount to be determined at trial;

B.      Enjoin Kirst from misappropriating, using and/or disclosing Westinghouse's Confidential Information, including, but not limited to, the Misappropriated Information;

C.      Order Kirst to return to Westinghouse any and all information, documents, software, materials, work product or equipment provided to him by Westinghouse or taken by him from Westinghouse, or relating to Westinghouse, whether in printed or electronic form or otherwise, including, but not limited to, the Misappropriated Information;

D.      Enter an order declaring that Kirst (i) at all relevant times, was a U.S.-based employee and (ii) waived any employment-related protections and claims afforded to him under Belgian law; or, in the alternative, should this Court find that Kirst was not a U.S.-based employee through and including his separation on December 19, 2019, order Kirst to repay to Westinghouse an amount equal to the Tax Equalization and other U.S.-based employee benefits paid by Westinghouse to or on behalf of him;

E.      Award Plaintiff's reasonable attorneys' fees and litigation costs for this action; and

F.      Award such other and further relief as the Court deems just and proper.

## Jury Demand

Plaintiff demands a trial by jury on all counts of its Complaint so triable.

Date    October 29, 2021                      Respectfully submitted,
        Pittsburgh, Pennsylvania

                                              **K&L GATES LLP**

                                              */s/ Amanda R. Cashman*
                                              J. Walker Coleman, IV (Fed. ID. No. 6007, S.C.
                                              Bar No. 66196)
                                              Amanda R. Cashman (Pa. Bar. No. 306843)

                                              K&L Gates Center
                                              210 Sixth Avenue
                                              Pittsburgh, PA 15222
                                              Telephone: 412.355.6500
                                              Facsimile: 412.355.6501
                                              Walker.coleman@klgates.com
                                              Amanda.cashman@klgates.com

                                              ***Attorneys for Plaintiff***